Entered: July 31, 2006
Signed: July 31, 2006

**SO ORDERED**



NANCY V. ALQUIST
U. S. BANKRUPTCY JUDGE

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND
### (Greenbelt Division)

In re:                                    *

EMAD EMILE DIDES,              *          Case No. 04-30976-TJC

                                             (Chapter 7)

          Debtor.                     *

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

**MEMORANDUM DECISION IN SUPPORT OF ORDER GRANTING VERIFIED
MOTION [28] FOR RECONSIDERATION OF PRIOR ORDER, AND,
UPON RECONSIDERATION, DENYING DEBTOR'S REQUEST
THAT ORDER [25] COMPELLING TURNOVER OF
PROPERTY OF THE ESTATE TO THE TRUSTEE BE VACATED**

Before the Court is the Verified Motion [28] for Reconsideration of Order Granting Motion

to Compel Turnover of Property of the Estate (the "Motion"), filed on January 24, 2005 by Emad

Emile Dides (the "Debtor"), the Opposition [33] thereto filed on January 28, 2005 by Scott D. Field,

Chapter 7 trustee in this case (the "Trustee"), and the Debtor's Surreply [35] filed on January 29,

2005.  The Court held hearings on the matter on April 6, 2005 and April 7, 2005 to reconsider its

Order [25] Granting Emergency Motion [21] to Compel Turnover of Property of the Estate to

Trustee, entered on January 21, 2005 (the "Turnover Order").  Having conducted those hearings,

and having considered the evidence, the pleadings, argument of counsel and the record in this case,

the Court finds that the Debtor has not stated grounds for the relief requested and the Court declines to vacate the Turnover Order.

## I.    <u>FINDINGS OF FACT</u>

The Court finds the facts stated herein based upon an evaluation of the evidence, including the credibility of witnesses and the inferences which the Court has found reasonable to draw from them.

### A.    The Evidence

Various witnesses testified in this case about the same facts, each from a different perspective:

#### 1.    The Story as Told by the Dides Brothers

The Debtor and his brother, Kamal Dides, testified at the April 2005 hearings.  The brothers are collectors of eclectic items.  They travel the world and shop on eBay and other venues for all kinds of things, from porcelain and crystal statues and glassware to silver coins, flatware and jewelry.  When he's not engaged in this activity, the Debtor serves as an officer of a travel business called One World Services, Inc.  Ms. Rona Fletcher ("Ms. Fletcher") was a neighbor and long-time friend of the Debtor.  He asked her to assist him once in a while with the business.  Sometimes she was paid for this service.  He also helped her financially over the years.

In late 2002 or early 2003, Kamal Dides and his wife separated.  Unable to trust his estranged wife, in March 2003, Kamal Dides loaded a van with items of property of some value to him and drove from Texas to Maryland to leave it with his brother.  When he arrived, he discovered that the Debtor did not live alone, that he rented rooms in his house to others.  He also never locked the door.  Kamal Dides did not feel comfortable leaving his property in the house, so the brothers locked it up in a spare room in an office once used by the Debtor.  Valuables thus safely deposited,

Kamal Dides exited the scene for the next year and a half.

In August of 2004, the Debtor went to jail.[1]  In September of 2004, he filed his voluntary chapter 7 petition.  In October of 2004, Kamal Dides returned to Maryland.  Ms. Fletcher, whom he had never met,  picked him up at the airport.  Kamal Dides stayed with her for several days.  During this visit, Ms. Fletcher took Kamal Dides to the office and he confirmed that his property was still there.  He did not tell her that this property belonged to him and played "dumb" while she opined on its value.  He did, however, ask for her help in finding another place to store it all.  Eventually, unable to find facilities acceptably secure to him in Calvert County, Kamal Dides began asking relatives in the area for help.  A cousin in the D.C. area declined because there was too much money and/or liability involved.  A long-time friend in Reston, Virginia came to his rescue.  He then told Ms. Fletcher he was flying back to Florida to get his van and would be driving back within the week to retrieve the property from the Debtor's office.

Two days after he left, Ms. Fletcher told him that the property had been stolen.  He and the Debtor later learned that she had claimed to others in the travel agency office that she had power of attorney to act on the Debtor's behalf while he was in prison.  They also learned that she had entered the office, removed the property and was attempting to sell it.  Despite the theft, neither Kamal Dides nor the Debtor took any action for the next three months.

On January 11, 2005, the Debtor was released from prison.  On the same day, Kamal Dides returned to Maryland.  By that point, Ms. Fletcher had obtained a restraining order, or "peace order," forbidding the Debtor from going to her property or calling her, and had admitted to the Debtor and/or his brother that she had taken the property to the Calvert County Sheriff's

---

[1]    Some of the witnesses at the trial on April 6, 2005 stated that they believed the Debtor went to jail in September 2005.  However, the Debtor testified that he was incarcerated from August 16, 2004 through January 11, 2005.  *See* Transcript of Hearing, April 6, 2005, p. 93, lines 22-25.

3

Department.  The Debtor and Kamal Dides went to the Sheriff's Department several times to identify the property and obtain its release but were unsuccessful.

On February 11, 2005, the Debtor contacted Ms. Fletcher's attorney and demanded the return of the missing belongings by 7:00 p.m. that evening or he would call the police.  He also accused Ms. Fletcher of fraud in connection with workmens compensation and insurance.  On March 10, 2005, the Debtor wrote to Sheriff Mike Evans complaining that the Sheriff's Department was protecting a thief and that he would hold the department liable for the property.  Attached to the letter was a list of items of property that Ms. Fletcher removed from his office and from his house. Despite these protestations and the brothers' visits to the Sheriff, the property remains in the custody of the Sheriff's Department.

2.      The Story as Told by Rona Fletcher

Rona Fletcher testified at the April 2005 hearings.  Ms. Fletcher has known the Debtor since approximately 1992.  They were neighbors.  She cleaned his house.  He also employed her to clean the offices of two travel agencies he owned and operated.  From time to time, she also answered phones and made bank deposits.  She also helped him and another brother who lives in Texas, Sam Dides, collect rents from their various tenants, some of whom lived in her neighborhood. Sometimes she assisted him at his work for free, sometimes he paid her for it.  He also helped her with some financial troubles over the years.

In September of 2004, after the Debtor went to jail, he asked her to continue to help answer phones and pay bills.  He also asked her to continue her rental collection efforts.  In October of 2004, the Debtor asked Ms. Fletcher to move several items of property from his home to his office, including porcelain statues, coins and jewelry.  Most of these items had been in the Debtor's house for at least six years.  He had shown them to her on various occasions as he told her about his

travels.  As requested, she stored these items at the office along with other property previously placed there by the Debtor.

Also in October of 2004, Kamal Dides came to Maryland.   He and Ms. Fletcher had met once very briefly about a decade ago.  Because the Debtor's house was "a mess" due to ongoing renovations, Kamal Dides did not want to stay there, so he stayed with Ms. Fletcher.  During this visit, she took him to the office to show him the property being stored there.  Kamal Dides expressed surprise at the quantity of "crap" in the office, and never mentioned that he owned any of it.  He and Ms. Fletcher then looked for alternate storage options, but the Debtor did not want the property to be placed in storage.  Later that month, she moved this property and additional items that had been stored at the Debtor's office to her house because the Debtor had arranged for the sale of the business and he asked her to remove it.

By December of 2005, the relationship between Ms. Fletcher and the Debtor had deteriorated.  She received threats from the Debtor and from Sam Dides in Texas about her failure and/or refusal to collect rents from their tenants.  People began demanding refunds from her.  The Debtor yelled at her about the crystal collection.  He accused her of forging checks in the business and stealing rental income and threatened criminal action against her.  By the time the Debtor was released from prison in January of 2005, she had sought and obtained a restraining order against him.  When the Trustee in this bankruptcy case requested that she turn over the property to him, she gave it to the Sheriff.

3.       The Story as Told by Sergeant Michael Moore

Sergeant Michael Moore ("Sgt. Moore") testified at the April 2005 hearings.  He is a sergeant with the Criminal Investigation Section of the Calvert County Sheriff's Department.  He has been in law enforcement for approximately twenty seven years.  At the end of 2004, he received

a call from Ms. Fletcher alleging certain questionable activities associated with the Debtor's travel

company.  They arranged to meet at the Sheriff's Department where she brought him a box of

papers relating to the business.  On January 25, 2005, Ms. Fletcher dropped off a carload of boxes

at the Department and a property coordinator employed by the Sheriff's Department took an

inventory.  A report was generated.  By this time, Sgt. Moore had conversed with Ms. Fletcher

several times, had visited with the Debtor and Kamal Dides at least twice, and had talked to the

States' Attorney.  He had also been served with the Trustee's Emergency Motion [21] to Compel

Turnover of Property of the Estate to the Trustee (the "Motion for Turnover").  At no time before

the January 25, 2005 visit with the Debtor and Kamal Dides did he get the impression, nor was he

directly told by either Dides brother, that the property belonged to anyone other than the Debtor.

   B.     The Bankruptcy Case - the Story as Told by the Debtor's
          Schedules and Statement of Financial Affairs

The Debtor filed a voluntary petition under chapter 7 of the Bankruptcy Code on September

10, 2004.  On October 12, 2005, the Debtor filed his Schedules [15] and Statement of Financial

Affairs [16].  On his schedule of personal property, the Debtor listed an interest in various items of

property totaling $2,060.00, including some CDs and a crystal collection valued at $300.00.  On his

Statement of Financial Affairs, the Debtor indicated the he was not holding any property for another

person.  These documents were signed under penalty of perjury.  The meeting of creditors pursuant

to Section 341 of the Bankruptcy Code was first set on November 5, 2004.  It was finally held on

January 25, 2005, the same day that the Dides brothers visited Sgt. Moore.

Approximately one week before that, on January 19, 2005, the Trustee filed the Motion for

Turnover.  In that motion, the Trustee stated that on the previous day, he had received telephone

call from Ms. Fletcher.  Ms. Fletcher told the Trustee that she was in possession of certain items of

personal property belonging to the Debtor, including a pearl necklace, emerald and diamond

necklace, bracelet and earrings, several settings of sterling silver flatware, and a collection of crystal statues and/or stemware. She also told the Trustee that the value of these items was approximately $100,000.00 and that the Debtor asked her to safeguard them for him while he was in prison. The Trustee sought an Order directing Ms. Fletcher and the Calvert County Sheriff's Department to turn over these items to him as property of the estate.

On January 19, 2005, the counsel for the Debtor filed a Preliminary Response [22], indicating that he had no contact with the Debtor but would attempt to obtain the Debtor's input and cooperation. The Court granted the Trustee's emergency turnover motion by Order [25] entered on January 21, 2005. These proceedings followed.

## II.    DISCUSSION

A.    Procedural Considerations

At the outset, the Court is asked to decide whether the Trustee has put his turnover case before the Court in the proper procedural posture. The Debtor argues that the Trustee is attempting to obtain property that belongs to Kamal Dides, thus ownership interests are at issue and declaratory judgment is necessary. *See* Fed. R. Bankr. Proc. 7001(9) (adversary proceeding includes a proceeding to obtain a declaratory judgment). Pursuant to Fed. R. Bankr. P. 7001(1), an adversary is required for a "a proceeding to recover money or property, *other than a proceeding to compel the debtor to deliver property to the trustee*." Fed. R. Bank. P. 7001.

The instant matter was commenced as a contested matter under Federal Rule of Bankruptcy Procedure 9014(a) when the Trustee filed the Emergency Motion for Turnover [21]. The Emergency Motion for Turnover seeks, in its prayer for relief, "that the Court enter an order compelling the Debtor to immediately turnover the Estate Property to the Trustee and authorizing the Calvert County Sheriff's Department to turnover the Estate Property directly to the Trustee...."

7

The relief sought in this motion is common in chapter 7 bankruptcy cases where trustees discover that debtors may be in possession (or constructive possession) of property of the estate (that should now be in the hands of the trustee), and such actions are routinely and properly brought by contested matter.[2] *See* Fed. R. Bankr. Proc. 9014(a).  Even if an adversary proceeding would have been the proper place to start, it is not necessarily improper to permit the action to go forward having begun as a contested matter, particularly in circumstances like this one where all parties received adequate notice and participated fully in an evidentiary hearing on all issues.  *See The CIT Group/Business Credit, Inc. v. Official Comm. of Unsecured Creditors of E-Z Serve Convenience Stores, Inc. (In re E-Z Serve Convenience Stores, Inc.)*, 318 B.R. 631 (D. M.D.N.C. 2004) (even if a party does not waive the right to an adversary proceeding, the lack thereof will be deemed "harmless error" if there is no demonstrable prejudice to a party's right to due process).

The Debtor here cannot demonstrate that failure to litigate this matter by adversary proceeding prejudices his right to due process.  The issues were fully litigated.  The Debtor fully participated, submitted evidence and cross-examined adverse witnesses.  The Court devoted one and a half days to evidentiary hearing and argument of counsel in this matter.  Making the parties start over at this point is a wasteful use of judicial resources and would needlessly elevate form over substance.  For this reason, the Court will deny the Debtor's request to dismiss the motion on procedural grounds.

B.      Property of the Estate

Moreover, the Court is not convinced that Kamal Dides owns any of the property sought by

---

[2] In addition, because the Court hereinafter finds that the property is not property of Kamal Dides but is property of the estate, this matter fits squarely within the exception to Rule 7001 (an adversary proceeding is required for "a proceeding to recover property, other than a proceeding to compel the debtor to deliver property to the trustee"), and is properly brought by contested matter.

the Trustee.  For example, during his direct examination by Debtor's counsel, he testified that:

> "Q:     Mr. [Kamal] Dides, I know some time has past.  But do you have a recollection of the type of category, amount of items that you took to Mr. Emad Dides?
>
> A:     There's quite a bit of, you know, it -- the collection has been going on for about 15 years.  You know, it's not just one trip and one time, whatever it is.  I mean when you're collecting crystals, you're collecting crystals throughout years... they [Swarovski, the crystal manufacturing company] come up with one item of the year.  And if you can grab it in the early stages and from the company, you can pay a good price for it. Then they're gone.  So, if you don't get it, you hunt for it, and plus -- plus we had some coins, sliver coins.  We had some silverware, we had the Millennium Collection, the Bradford Millennium collection, and on and on.  And some -- some -- really arts, some crystal arts that's worth a lot of money.  And -- it's -- it's quite a collection.
>
> Q:     How do you know these items are worth a lot of money?
>
> A:     Because I paid for them and I know -- I know what it is and how much they go in price and up in price throughout the years.
>
> Q:     Do you have a recollection of what you paid for these items in the cumulative up to the date that you took them to Mr. Emad Dides?
>
> A:     Oh I can't -- I can't give you an exact -- I'm sorry -- I mean there's no way.  I mean like -- what I paid for them and what they're worth is two different things."

*See* Transcript, April 6, 2005, pp. 15, lines 12-25; p. 16, lines 1-16.

> Q:     Well, we can agree that the property was valuable enough that you wanted to move it away from you wife, correct?
>
> A:     Yes, sir.
>
> Q:     Now you're moving it to your brother who doesn't own a home and it's subject to renters.  So, you move it to an office building, is that your testimony?
>
> A:     Sir, I moved that property because it's not valued that much to me as much it was  my hobby that I am collecting it, and it's valuable -- nothing to do with my wife because I thought she will not care about such things and I was afraid that she's probably going to sell it or do something with it.  So, you -- this is personal.  This is a hobby.  I enjoy collecting things and I've been doing it for a long time. So, can you give me a direct question, I'll be more than happy

to answer it, sir."

*See* Transcript, April 6, 2005, p. 61, lines 10-25.

It was further revealed on cross-examination that Kamal Dides could not recall what items he stored at the Debtor's office, and that he repeatedly referred to a document brought with him to the witness stand that had not been introduced or admitted into evidence. The document was a copy of the list of property attached to the Debtor's March 10, 2005 letter to the Calvert County Sheriff's Department, which the Debtor gave him. He also did not recall testifying at the Debtor's meeting of creditors that he valued the property at approximately $300,000. He had no receipts or other evidence of his purchases. The property was not insured. Kamal Dides recalled that the first time he informed anyone that he owned any of the property was in January 2005.

The Court has reviewed the testimony of all the witnesses and finds that the Debtor and Kamal Dides were not credible. Neither brother seems to really know what property they are talking about and their statements about the identity and value of the items are inconsistent. The Court finds it not credible, for various reasons, that Kamal Dides owned any of the property that the Trustee seeks to recover: (1) both the Debtor and Kamal Dides referred to the property as the Debtor's property (to both Ms. Fletcher and to Sergeant Moore) until January 2005; (2) Kamal Dides did not insure property that he testified at one point was worth $300,000 (an amount he later could not remember stating); (3) Kamal Dides did not immediately report the property as stolen or even to come to Maryland to investigate until about three months after he learned it was missing; (4) Ms. Fletcher, as a friend and sometime employee of the Debtor, often did as the Debtor asked, and the Court finds credible her testimony that the Debtor asked her to move the property from one place to another; and (5) the Debtor did not disclose that he was holding property for another in the appropriate sections of his sworn schedules and Statement of Financial Affairs. The Debtor's

explanation about the absence of listed "property held for another" -- that he expected to give Kamal's collectibles back to him in the near future, therefore he did not disclose it -- is not credible. The Debtor also failed to disclose that he was also holding a mink coat for a friend in New York named "Chris," which may or may not be included in the items held by the Calvert County Sheriff's Department.

Section 541 of the Bankruptcy Code provides that upon the commencement of a case, with several inapplicable exceptions, all legal and equitable interests in property of the Debtor became property of the estate. 11 U.S.C. § 541(a). Section 521 of the Bankruptcy Code requires the Debtor to, among other things, surrender to the Trustee all property of the estate. 11 U.S.C. § 521(4). The Debtor must also disclose an "an accurate and complete schedule of assets with proper values and a truthful statement of affairs in order to convey a complete and accurate portrayal of their financial situation." *In re Simpson*, 306 B.R. 793 (Bankr. D. S.C. 2003) ("the court system, trustees, creditors and other interested parties rely on the schedules and statements in order to make informed decision, and the importance of accurate schedule cannot be overstated). The Court concludes, based on its review of all of the evidence, that the Property constitutes Property of the estate which should be turned over to the Trustee.

For these reasons, the Debtor's request that Order [25] compelling turnover be vacated is DENIED. A separate Order will issue.

cc:    Emad Dides, Debtor
       Mr. Kamal Dides
       John Burns, Esq.
       Stephen A. Metz, Esq.
       Laura L. Martin, Esq.
       Sergeant Moore, Calvert County Sheriff's Department

Trustee
U.S. Trustee